**WELLS PETROLEUM CO.**

v.

**FIDELITY–PHENIX FIRE INS. CO. OF NEW YORK et al.**

No. 51C1622.

United States District Court, N. D. Illinois, E. D.

June 10, 1954.

Ruff & Grotefeld, Chicago, Ill., for plaintiff.

Heineke & Conklin, Chicago, Ill., for defendants Fidelity-Phenix Fire Ins. Co. and Nat. Fire Ins. Co. and Provident Fire Ins. Co.

Heth, Lister & Flynn, Chicago, Ill., for Equitable Fire & Marine Ins. Co.

LA BUY, District Judge.

This is an action upon policies of fire insurance issued by the defendants to the plaintiff seeking the recovery of damages for loss by fire on November 9, 1950, to a certain building owned by the plaintiff and described in defendants' policies of insurance. Copies of the policies are attached to plaintiff's complaint, and it is alleged in the complaint that they were in force and effect on November 9, 1950, the date of the fire. Each of the defendants have filed a separate answer to the plaintiff's complaint and

therein denied that their respective policies of insurance were in force and effect on November 9, 1950, the date of the fire, and affirmatively allege that said policies of insurance were cancelled on August 3, 1950, by virtue of replacement and substitution of the insurance by the plaintiff.

The plaintiff is a corporation organized under the laws of the State of Illinois, with its principal office and place of business located in the State of Illinois; and each of the defendants is a corporation organized under the laws of States other than the State of Illinois, and each is authorized to do business in the State of Illinois.

The amount in controversy, as between the plaintiff and each of the defendants, is in excess of the sum of $3,000, exclusive of interest and costs.

Now at the close of all of the evidence offered in the case on behalf of the plaintiff, each of the defendants has filed a motion for directed verdict. This necessitates a summary of the facts as they appear from the plaintiff's evidence and a review of the law which, in the opinion of the Court, is applicable thereto.

The property owned by the plaintiff and described in the defendants' policies of insurance was located at the junction of Highway 66 and 66A in Will County, Illinois, and consisted of a hollow concrete block and frame building used for automobile filling station and restaurant purposes.

In September of 1946 the plaintiff appointed B. E. Baal to act as its insurance broker in the placing of fire and extended coverage insurance upon the property involved in this suit. In this appointment Baal was instructed and empowered by the plaintiff to obtain a gross amount of insurance, approximately $32,000, upon the property and to do all that was necessary to keep the property insured in that amount. Baal was not instructed or limited in any manner as to the identity of the companies issuing such insurance, nor as to the specific amount of insurance to be placed in any particular company.

Baal was, and is, a licensed insurance broker in the State of Illinois and in 1946, and for some time prior thereto, he officed in the office of Homer Gwinn & Company, a general insurance agency licensed by the State of Illinois. Pursuant to the direction and authority given to him by the plaintiff, he placed the insurance coverage requested through the Homer Gwinn & Company agency in six companies, including the four defendant companies, as follows:

| Company | Policy No. | Amount |
| --- | --- | --- |
| Equitable Fire & Marine | 209558 | $ 7,150.00 |
| Home Insurance | 6874 | 6,300.00 |
| Fidelity-Phenix Fire | OCWDB 6827 | 4,200.00 |
| National Fire | OC 282150 | 5,000.00 |
| Provident Fire | BK 22542 | 5,000.00 |
| Rhode Island | 15–25016 | 3,150.00 |
| | | $30,800.00 |

There was a small additional amount of coverage placed in certain of these companies covering shrubbery and the like, not material here, but which brought the total coverage to the approximate figure of $32,000.

Baal continued his office arrangement with Homer Gwinn & Company until June 23, 1950, when, as the result of a disagreement not material here between him and Mr. Homer Gwinn of the agency, he left that agency and moved his office to the American Insurance Agency, Inc. Thereafter, on August 7, 1950, Baal addressed a letter to Homer Gwinn & Company in which he stated that he had replaced all business which he had written through the Homer Gwinn & Company agency as of August 3, 1950, and that the policies would be forwarded through the clearing house for cancellation on a prorata basis. The pertinent portion of this letter is as follows:

"Furthermore, as I construe your threat of serving cancellation notices to my clients, tantamount to a notice to me that you will not further service my business my only recourse, to protect my business and

safeguard the interest of my clients, is to pick up all policies written by or through your agency and return them to you for cancellation prorata as of August 3, 1950, the day on which I received your notice and *on which day I arranged for replacement coverage.*" (Emphasis supplied.)

On August 15, 1950, the Homer Gwinn & Company agency replied to Baal's letter of August 7, 1950, by stating that should Baal elect to cancel all business written through the agency, as stated in his letter, the *short rate* basis of premium return would be insisted upon. Baal's reply to the Homer Gwinn & Company letter of August 15, 1950, on the following day, August 16, 1950, stated, in part, as follows:

"So far as other business is concerned, I have consulted authorities who have sustained my position that your action in your letters of August 2nd and 3rd in truth and in fact called for the cancellation of my business and a prorata credit is in order as of August 3rd, *the day on which I covered all exposures.* The policies are going through the clearing house as fast as I pick them up." (Emphasis supplied.)

As appears from this exchange of correspondence, Baal did on August 3, 1950, replace all of the insurance which he had placed through the Homer Gwinn & Company agency with policies of insurance placed in other companies through the American Insurance Agency, Inc. With specific reference to the policies obtained for the plaintiff through the Homer Gwinn & Company agency, as above set forth, the following policies were so placed in substitution for them:

| Company | Policy No. | Amount |
|---|---|---|
| Birmingham Fire | 2938 | $ 5,000.00 |
| Columbia Fire | OC 959434 | 6,000.00 |
| Commercial Union | OC 20590 | 5,000.00 |
| Detroit Fire & Marine | OC 908456 | 5,000.00 |
| Pearl Assurance | OC 1138882 | 5,000.00 |
| Reliance | 20409 | 5,000.00 |
| | | $31,000.00 |

It will be noted that these policies were written in a gross amount approximately the same as the policies which they were intended to replace. Further, they were written for the unexpired term of those policies and at the identical rate of those policies, it being the admitted intention of Baal to effect this replacement and substitution without charge to his client. The only manner in which this could be effected would be by obtaining cancellation of the original policies upon a prorata basis; that is, by effecting a full return of the unearned premium to be applied upon the premium charged for the new policies.

The dispute reflected in the above-described exchange of correspondence between Baal and the Homer Gwinn & Company agency with reference to the basis of determining the return premium upon the cancelled policies continued through and beyond the date of the fire here in question, November 9, 1950. In this dispute Mr. Baal insisted that the return premiums should be determined upon a prorata basis and Mr. Homer Gwinn insisted that it should be determined upon a short rate basis. When it became evident that the dispute could not be resolved, Mr. Baal on or about November 24, 1950, determined to return the cancelled policies direct to the various companies with the same request that the return premium be figured upon a prorata basis as of August 3, 1950. In this connection, he prepared separate lists of the various policies issued in the several companies, including the defendant companies, and upon the lists submitted to the defendant companies there was inserted a note pertaining to the policies here in question as follows:

"Total loss main building occurred on November 9, 1950, which loss is admitted and being adjusted by replacement carriers."

Each of the four defendant companies refused to accede to Baal's demand that the return premium upon the cancelled policies be figured upon a prorata basis rather than upon a short rate basis, as provided by the terms of the policies

themselves. The Home Insurance Company which, as of the date of the fire, occupied an identical position with that of the four defendant companies did, however, accede to this demand and paid to the plaintiff through its broker, Baal, a return premium figured upon a prorata basis as of August 3, 1950. The Rhode Island Insurance Company had gone into receivership prior to August 3, 1950, and the claim for return premium figured upon a prorata basis as of August 3, 1950, was filed on behalf of the plaintiff by Baal with the receiver. It is significant that the plaintiff treats both The Home Insurance Company policy and the Rhode Island policy as not having been in force and effect on November 9, 1950, the date of the fire, although, as indicated, both of those companies occupied an identical position with that of the defendant companies on the date of the fire.

Following the occurrence of the fire the replacement companies, above listed, assigned the loss to the Underwriters Adjusting Company for investigation and adjustment. The Underwriters Adjusting Company's representatives then proceeded to meet with representatives of the plaintiff herein and to adjust the loss on behalf of those companies. In so doing, the Underwriters Adjusting Company did not represent any one of the defendant companies. In prorating the loss, however, between the replacement companies, the face amount of the policies of the defendant companies was included for proration purposes. This resulted in the replacement companies paying a somewhat lesser amount under their policies to the plaintiff than would be the case if the policies of the defendant companies were not included in the proration. In this connection, the replacement companies entered into an agreement with the plaintiff that in the event it should be determined that the policies of the defendant companies herein sued upon were, in fact, cancelled prior to the date of the loss, the adjustment would be reopened and payment made upon a proration excluding the face amount of the policies issued by these defendants. It is again significant that the policies issued by The Home Insurance Company and by the Rhode Island Insurance Company were not included in this proration.

Prior to effecting replacement of the original policies secured for this plaintiff by Baal through the Homer Gwinn & Company agency, Mr. Baal advised Mr. George B. Warton, Treasurer of the plaintiff corporation who was in charge of the insurance program of that company, of his intentions with respect to the insurance coverage. Mr. Warton agreed with Mr. Baal's proposals and delivered the original policies to Baal for cancellation. After the replacement policies above-described were issued through the American Insurance Agency, Inc., as above set forth, they were delivered by Mr. Baal to Mr. Warton as replacement of and in substitution for the original policies. Simultaneously with the delivery of these replacement policies to the plaintiff, an invoice dated August 26, 1950, and covering the premium charged upon the new policies, was delivered by Baal to the plaintiff company in which a full credit for this charge was given. It appears from this invoice that the total premium upon the replacement policies was the sum of $629, and that a full credit in this amount was allowed by Baal, this credit being the unearned premium upon the original policies figured upon a prorata basis. All of this was fully and completely entered and recorded in the plaintiff's corporate books and records prior to the occurrence of the fire.

It clearly appears from the plaintiff's evidence that it was not the intention of either the broker, Baal, or the insured, plaintiff herein, at any time prior to the occurrence of the fire to obtain additional insurance coverage upon the property and rather that it was their clear intention to replace the original policies issued through the Homer Gwinn & Company agency and to substitute therefor new policies issued through the American Insurance Agency, Inc. There was

no desire on the part of the plaintiff to vary its original instructions to its broker, Baal; namely, to procure coverage upon the property in the approximate sum of $32,000. It was not their intention to double this coverage or to increase it in any manner. It further appears that the plaintiff did not report the occurrence of this fire as a loss under any of the defendant companies' policies and did not present a claim under said policies and did not file a sworn proof of loss under said policies. Each of the policies sued upon provided, in part, as follows:

> "*Cancellation of policy.* This policy shall be cancelled *at any time at the request of the insured,* in which case this Company shall, upon demand and surrender of this policy, refund the excess of paid premium above the customary *short rates* for the expired time. This policy may be cancelled at any time by this Company by giving to the insured a five days' written notice of cancellation with or without tender of the excess of paid premium above the pro rata premium for the expired time, which excess, if not tendered, shall be refunded on demand. Notice of cancellation shall state that said excess premium (if not tendered) will be refunded on demand."
> (Emphasis supplied).

It is the contention of the defendants that the authority of the broker, B. E. Baal, from the plaintiff corporation was sufficiently broad to enable him to effect replacement and substitution of the original policies as he saw fit and that, in any event, all of his acts in this regard were fully and completely agreed to and ratified by the plaintiff corporation.

It is the further contention of the defendants that its policies of insurance were cancelled at the request of the insured prior to the occurrence of the fire and that they were cancelled by replacement and substitution of policies of insurance in other companies. Ratification of the replacement and substitution of the original policies was made by the insured long prior to the occurrence of the fire and this early ratification was confirmed by virtue of the election of the insured to present claims under the substituted policies and to collect payment of the proceeds thereof.

With reference to the cancellation clause contained in the standard policy of fire insurance, as above-quoted, it is stated in Richards On Insurance, Fifth Edition, Volume 3, Section 531, p. 1760, as follows:

> "A contract of insurance presupposes mutual confidence and satisfaction. Therefore, it is a wise provision which empowers either party to terminate or cancel the policy at his option, at any time, on just terms, without the consent of the other. * * * No action on the part of the insured is necessary to effect a cancellation other than the mere giving of notice of his wish to cancel. * * *"

and Section 532, pp. 1764, 1765, 1772:

> "The insured can cancel forthwith at any time by request. No written notice is required, and by the better reasoning, the surrender of the policy is not a prerequisite. Cancellation is immediate and does not await return of unearned premium, or surrender of the policy by the insured. * * *"

> "The sole requirement to effect a cancellation by the insured is a definite and unconditional request for cancellation actually communicated to the company. * * *"

> " * * * where even after loss the local agent of insurance companies informs the insured that a policy in one company has been cancelled, and the amount replaced in another company, the insured may ratify the unauthorized acts and is concluded by his election to ratify them, thus relieving the first company."

The above-quoted statements are fully supported by the cited cases, includ-

ing the following: State v. Hartford Steam Boiler Inspection & Insurance Co., 71 N.D. 329, 1 N.W.2d 52; Crown Point Iron Co. v. Aetna Insurance Co., 127 N.Y. 608, 28 N.E. 653, 14 L.R.A. 147; Gately-Haire Co. v. Niagara Fire Insurance Co., 221 N.Y. 162, 116 N.E. 1015; Atlantic Fire Insurance Co., of Raleigh, N. C. v. Smith, 183 Okl. 97, 80 P.2d 216; Insurance Commissioner v. People's Fire Insurance Co., 68 N.H. 51, 44 A. 82; Insurance Co. of North America v. Detroit and Security Trust Co., 9 Cir., 51 F.2d 155.

The leading case in the State of Illinois on the issue presented in this case; namely, cancellation by virtue of replacement and substitution, is that of Larsen v. Thuringia American Insurance Co., 208 Ill. 166, 70 N.E. 31. In that case the facts are closely analogous to those in the instant case, and there the trial court directed a verdict for the defendant and entered judgment for the defendant upon the directed verdict. This verdict was affirmed both by the Appellate Court of Illinois, First District, 108 Ill.App. 420, and by the Supreme Court. In its opinion, the Supreme Court said, 208 Ill. at page 173, 70 N.E. at page 33:

"We regard the case of Arnfeld & Son v. [Guardian] Assurance Co., 172 Pa. 605, 34 A. 580, as very similar in its facts to the facts of the case at bar, and the reasoning of that case very cogent, and in support of the views we entertain.

"We think upon both grounds—that of ratification and election—under the facts disclosed by this record appellant was bound by the bargain he had advisedly made, and that the judgments of the circuit and Appellate Courts are right, and the judgment of the Appellate Court is affirmed."

The facts in the Arnfeld & Son case, relied upon by the Supreme Court of Illinois in the Thuringia American Insurance Co. case, were very similar to those in the instant case and in that early case the Supreme Court of Pennsylvania said, 172 Pa. at pages 608–609, 34 A. at page 581:

"It may be conceded there was no formal technical cancellation of the policy issued by the defendant. It was in possession of plaintiffs. Defendants had not returned or offered to return to them the premium. But was there a substitution of the liability of a third party for that of the defendant, by the consent of the plaintiffs, defendant, and the third party? Defendant's contract was one of indemnity in a fixed amount against loss by fire on certain goods. A third party, the Queen Insurance Company, took its place, and indemnified plaintiffs against precisely the same loss, in the same amount, on the same goods, then stood by its contract, and paid the loss. This was a complete and effectual substitution of another insurer in place of defendant, and this was by the consent of all parties interested; for it is not important to discuss the exact authority of an insurance broker, as Zugschmidt was, and determine to what extent he was the agent of the insured and the insurers,—that is, where the line should be drawn. It is undisputed he acted throughout for the plaintiffs, and for both companies, and communicated with both; and all consented, and ratified his acts. Nor is it controlling that there was no formal cancellation or surrender of the first policy. The plaintiffs got the policy in the Queen Company, and, what is more important, got the money upon it. The premium they had paid to the defendant, in so far as they were entitled to a return of it, is owing by the defendant, through the broker, to the Queen Company, to whom the broker, acting for plaintiffs, transferred defendant's liability. Plaintiffs ought to have surrendered for cancellation defendant's policy. What ought to have been done, equity will consider as having been done. The case is not unlike that of

a creditor who has taken surety for a debt. The surety declines to be longer responsible. The debtor procures a new surety, acceptable to the creditor, who takes the place of the first on a new note. The creditor retains possession of the old note. The new surety pays the debt. The creditor sues the first surety on the old note, alleging it had never been formally delivered up or canceled. In such case the learned judge of the court below would very promptly have said that, if a creditor be once paid, his mere possession of the old note would not warrant the exaction of a second payment of the same debt. It seems to us there is no distinction between the supposed case and the one before us, except that the first is a contract for suretyship, and the second of indemnity. The injustice worked by permitting a second recovery in the one is the same as in the other. No party ought to be allowed to recover twice for the same debt, no matter how many instruments evidencing the amount of his debt he may hold, nor how many distinct obligors there may be on them. Most creditors are content if their debt be paid once. All ought to be."

Another strikingly similar case is that of Finley v. New Brunswick Fire Insurance Co., 193 F. 195. There the Circuit Court for the Eastern District of Washington, Eastern Division, said, 193 F. at page 200:

"Again, it is said that the defendant could not cancel the policy without tendering back or refunding the premium paid. This much might be conceded if this were a simple case of cancellation, but the rule has no application where one policy is substituted for another by consent."

In Pagliero v. Merchants Fire Assurance Corporation of New York, 169 F.2d 373, 374, the Circuit Court of Appeals for the Ninth Circuit said:

"Whether or not Otis & Browne had authority to cause the cancellation of the policy held by appellants with appellee and to procure the new policy presents a question which we think need not be determined. We are of the opinion ratification clearly appears. It is evident that Otis & Browne took out the policy with Home Fire and Marine Insurance Company assuming to act for appellant and for the purpose of replacing the policy in suit after having agreed to the cancellation of that policy. They informed appellants of the action taken by them before appellants made claim for payment from Home Fire and Marine Insurance Company. The $15,000 policy which Otis & Browne secured from Home Fire and Marine Insurance Company brought the total amount of insurance held by appellants to the same level that existed prior to the attempted cancellation of the policy held with appellee.

"We are in accord with the holding in several cases where the facts are almost identical with those in the instant case, that it was incumbent on appellants when informed of the action taken by their brokers, Otis and Browne, to elect which policy they could claim under. * * *"

In Strauss v. Dubuque Fire & Marine Insurance Co., 132 Cal.App. 283, 22 P.2d 582 at page 586, the District Court of Appeals for the First District of California said:

"It is next asserted that the policy issued by the defendants was never canceled. If the plaintiffs mean that the policy was never indorsed in ink 'canceled,' then their contention conforms to the facts. However, an insurance policy is in effect canceled when another policy is substituted for it. Stevenson v. Sun Insurance Office, 17 Cal.App. [280] 282, 288, 119 P. 529; New Zealand Ins. Co. v. Larson Lumber

Co., 7 Cir., 13 F.2d 374. That in the instant case there was a substitution is clearly supported by the evidence. * * *"

And in the case of Bache v. Great Lakes Insurance Co., 151 Wash. 494, 276 P. 549, at page 551, the Supreme Court of Washington said:

"As we understand counsel, it is conceded that the procuring of new insurance by an owner, or by his agent authorized so to do, for a term commencing before the expiration of the term of existing insurance, with intent to have the new insurance take the place of the existing insurance, and no intent to thereby acquire additional insurance, constitutes in law an effective, voluntary cancellation of the existing insurance. This, we think, is recognized to be the law in our decisions in Finley v. Western Empire Ins. Co., 69 Wash. 673, 125 P. 1012; Tacoma Lumber & Shingle Co. v. Fireman's Fund Ins. Co., 87 Wash. 79, 151 P. 91, and Violette v. Insurance Co. of Pennsylvania, 92 Wash. 685, 159 P. 896, 161 P. 343. * * *"

Murray Bernard Industries v. East & West Insurance Company, 7 Cir., 185 F. 2d 20; Hoover v. Millers National Insurance Co., 17 Wash.2d 407, 135 P.2d 846; Sanks v. St. Paul Fire & Marine Insurance Co., 131 Neb. 266, 267 N.W. 454 and Firemen's Insurance Co. v. Simmons, 180 Ark. 500, 22 S.W.2d 45.

For the foregoing reasons it is the Court's opinion that the policies of insurance herein sued upon were effectively cancelled on August 3, 1950, prior to the date of the fire, November 9, 1950, by virtue of replacement and substitution; that the physical possession of said policies in the hands of the plaintiff on the date of the fire and the fact that the unearned premium, whether prorata or short rate, had not yet been returned by the defendants to the claimant on the date of the fire is immaterial and the Court was therefore compelled to grant the motion of each of the defendants for directed verdict and, accordingly, will direct the jury to return the following verdict: "By direction of the Court we, the jury, find the defendants not guilty.", and will enter judgment for each of the defendants upon said verdict.